Filed 8/2/13  P. v. Meskan CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JUSTIN ALAN MESKAN,<br><br>        Defendant and Appellant. | A134000<br><br>(City & County of San Francisco Super. Ct. No. 214722) |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br><br>ROBERT NATHAN ALLEN,<br><br>        Defendant and Appellant. | A134304<br><br>(City & County of San Francisco Super. Ct. No. 202857) |

A jury convicted defendants Justin Alan Meskan and Robert Nathan Allen of assaulting two men but rejected allegations that the assaults were hate crimes motivated by the victims' race, ethnicity or national origin. Defendants were each sentenced to eight years in prison. Defendants raise multiple issues in separate appeals, which are consolidated for review. Meskan claims the prosecutor used suggestive questioning during cross-examination to introduce testimonial statements of an absent witness in violation of defendant's right to confront witnesses against him. Meskan and Allen claim prosecutorial misconduct during opening and closing statements to the jury; wrongful admission of evidence linking defendants with White supremacist groups; and sentencing errors. We find no prejudicial error and shall affirm the judgments.

## STATEMENT OF FACTS

On the night of November 9, 2010, cousins Alex Cauich-Dzul and Jose Omar Cauich went to the Nite Cap Bar in San Francisco's Tenderloin District.[1] Alex and Omar are Mexican nationals. Alex testified that he left the bar and was standing on the sidewalk waiting for Omar when someone came up to him and punched him in the face. A second punch landed immediately after the first, and he lost consciousness and fell to the ground. Omar looked out the bar's window to see Alex on the ground being punched and kicked by five White men. Omar ran from the bar, beer bottle in hand, to defend his cousin and was himself punched and kicked by the men.

A neighborhood resident saw the group confront Omar. The witness heard someone in the group of White men yell, "why don't you run across the street, you fucking spics, like you run across the border." One of the White men then punched Omar. Another man took the beer bottle from Omar's hand and hit him on the head with it. Omar fell to the ground. The White men "kicked . . . stomped and punched" Omar "for a long period of time" while yelling "White power" and "fucking spics."

The police arrived on the scene in a patrol car with lights on and the siren sounding. An officer saw Alex, bloodied and "semi-unconscious," being dragged from the street to the sidewalk by Omar and another man. The man assisting Alex then walked away and was seen near another man leaving the scene. Omar said the two men had been in the group of attackers and the police detained them. They were identified as Anthony Weston, who had assisted Alex, and defendant Allen. Weston was released and Allen was arrested.

Several hours later the police conducted a search of Allen's apartment, located on Geary Street only blocks from the bar. Allen lived with Weston and another man, Richard Trietsch, and the two were home at the time of the search. When the police investigator entered the studio apartment, she saw taped to the wall a photograph depicting Trietsch

---

[1]     Given a shared family name, we use the men's chosen first names: Alex and Omar. Omar was in Mexico at the time of trial and unavailable to testify. A transcript of his preliminary hearing testimony was read to the jury.

saluting a swastika flag. Trietsch has a swastika tattoo on his leg. A walk-in closet was searched and found to contain school work with Allen's handwritten name, paperwork belonging to Trietsch, and a hammer. The police found a paper that appeared to be a code key with runic writing set next to the English alphabet and coded phrases that, when translated, read "White power," "sick man" and "Trietsch." The runic alphabet is used by skinheads as a secret language. The hammer had "sick man" etched on it in runic code. Trietsch said the hammer belonged to him. Four computers were found during the police search. The police seized two of the computers, which they believed belonged to Allen. One of the seized computers had "pictures of Hitler and swastikas" as desktop wallpaper or a screen saver.

Three men were charged with a racially motivated attack: Weston and defendants Allen and Meskan, whom Weston identified as his accomplices. Weston had been friends with Allen and Meskan for years before the incident. Weston pleaded guilty and agreed to cooperate with the prosecution in exchange for a grant of probation.

Weston testified that on the day of the street fight he began drinking when he awoke in the morning. Later that day, he went out drinking with Allen and Meskan. The men returned to the Geary Street apartment late at night where they joined Trietsch and continued drinking. Meskan decided to go home and the other men walked with him, intending to "hit bars on the way." The four men were walking toward the Nite Cap Bar when they saw Alex. Weston's trial account differs from Alex's testimony of an unprovoked attack. Weston claimed that Alex bumped into him and Allen while crossing the street. Weston sarcastically said, "excuse me," and Alex reportedly responded by saying "fuck you" or "something to that effect" and raised his hands "like he wanted to fight." Weston punched Alex in the face. Weston is five feet eleven inches tall. Alex is about five feet three inches tall. Alex was stumbling backwards from Weston's blow when Meskan came up and punched Alex in the face. Alex fell to the ground, landing in the middle of the street. Meskan and Allen kicked Alex several times as he lay in the street. Weston did not see Trietsch strike Alex.

According to Weston, Omar then ran up to the group with a beer bottle in his hand. Weston knocked the bottle from his hand and hit him. Omar fell against a parked truck and Meskan punched Omar, knocking him to the ground. Weston kicked Omar once then "kind of felt like [Omar] had had enough." Weston saw that Alex was still lying in the street and, with another man, dragged Alex to the sidewalk. Weston heard police sirens and started to make his "get away" but was detained by the police, along with Allen. Meskan was walking further ahead and was not stopped.

At trial, Weston insisted that the beating of Alex and Omar was not racially motivated. Weston denied being a racist although he admitted being "affiliated" with white supremacist "skinhead" groups in the past and having the word "skin" tattooed on his side. Weston said Allen and Meskan were not skinheads, that the computer seized from the Geary Street apartment with the Hitler screen saver belonged to Trietsch, not Allen, and that Trietsch is a White supremacist. Weston denied hearing any racial slurs during the street fight. Weston did see Allen raise his hands in the air at the end of the fight and say something like "this is our town."

Meskan testified and denied being present at the street fight. Meskan said he was with his girlfriend until about 10:00 p.m. and then at home alone watching television. On cross-examination, Meskan admitted that he identified himself to jailers as a skinhead when arrested in March 2009 and again in December 2010 when arrested for the present offense. The prosecutor questioned Meskan about a conversation he had with Heather Williams, a friend of Meskan's girlfriend, who did not testify at trial. The prosecutor asked Meskan if he told Williams he had "been in a drunken brawl" at the Nite Cap Bar "with a couple of Mexicans." Meskan denied making such a statement.

## VERDICT AND SENTENCING

The jury convicted defendants of (1) assault upon Alex by means of force likely to cause great bodily injury (Pen. Code, § 245, subd. (a)(1))[2] with personal infliction of great bodily injury (§ 12022.7, subd. (a)); (2) simple assault upon Omar (§ 240) (a lesser

---

[2]     All further section references are to the Penal Code except as noted.

4

included offense to the charged crime of aggravated assault); and (3) battery upon Alex with personal infliction of serious bodily injury (§ 243, subd. (d)). The jury found not true allegations that the assaults and battery were hate crimes committed because of the victims' race, ethnicity or national origin. In a separate proceeding, the court found defendants had prior prison commitments. (§ 667.5, subd. (b).)

The court sentenced each defendant to eight years in prison: the upper term of four years for the assault upon Alex with a three-year enhancement for inflicting great bodily injury plus one year for a prior prison commitment. Sentence for the battery upon Alex was stayed. (§ 654.) A concurrent county jail term of six months was imposed for the assault upon Omar.

## DISCUSSION

**A Justin Meskan's appeal**

1. *The prosecutor did not commit misconduct when cross-examining defendant Meskan.*

Meskan claims the prosecutor committed misconduct by asking suggestive questions about a conversation with Heather Williams when Williams was unavailable as a witness to corroborate the statements attributed to him by the questions. The prosecutor asked Meskan if he told Williams he had been in a drunken brawl with a couple Mexicans, and Meskan denied making such a statement.[3] Meskan argues that the line of

---

3     The disputed cross-examination was as follows: "Q. Do you know an individual by the name of Heather Williams? [¶] A. Yes. [¶] Q. How long have you known her for? [¶] A. Can't say exactly. Maybe two or three years, maybe. [¶] [Defense Counsel:] I'm going to object to this as irrelevant, your Honor. [¶] The Court: Overruled. [¶] Q. . . . Would you consider her to be a good friend? [¶] No. [¶] Q . . . In November of 2010, how often would you socialize or speak with Heather Williams? [¶] A. She was Lindsey's [Meskan's girlfriend] best friend. So, I mean, I would see her frequently, you know, here and there, but not a good friend, no. [¶] Q. And after this incident was reported to you, . . . you talked with Lindsey – [¶] [Defense Counsel:] Your Honor, I'm going to object to this specifically in light of earlier proceedings in this case. [¶] The Court: . . . What is your question, Mr. [Prosecutor]? [¶] Q. . . . You spoke with Lindsey Powell and Heather Williams about your involvement in this case? [¶] [Defense Counsel]: That's my objection, Your Honor. [¶] The Court: Overruled. He may answer. [¶] [A.] There is no involvement in this case. [¶] Q. . . . Okay. Specifically, one week after this incident, you met in person with Heather Williams while you guys were taking care of Robert Allen's effects? [¶] A. Yeah. I met her to, um, put all the stuff in storage, yeah. [¶] Q. Okay. And, at that time,

5

questioning effectively introduced Williams's testimonial statements without an opportunity for cross-examination in violation of his right to confront witnesses against him. (*Crawford v. Washington* (2004) 541 U.S. 36, 59.) He also contends " ' "[i]t was improper to ask questions which clearly suggested the existence of facts which would have been harmful to defendant, in the absence of a good faith belief by the prosecutor that the questions would be answered in the affirmative, or with a belief on his part that the facts could be proved, and a purpose to prove them, if their existence should be denied." ' " (*People v. Mooc* (2001) 26 Cal.4th 1216, 1233; quoting *People v. Perez* (1962) 58 Cal.2d 229, 241.)

While testimonial statements of a witness absent from trial are inadmissible unless the declarant is unavailable to testify at trial and the defendant had a prior opportunity for cross-examination (*Crawford v. Washington, supra,* 541 U.S. at p. 59), no testimonial statements of an absent witness were presented here. Defendant was twice asked if *he* made statements to Williams, which he denied. Defendant argues that "the prosecutor's questions relayed to the jurors the substance of Ms. Williams['s] out-of-court statements that appellant admitted to her that he was involved in a bar fight with Mexican men." But a prosecutor's questions are not evidence. (*People v. Samayoa* (1997) 15 Cal.4th 795, 843-844.) The jury was clearly instructed on this point at both the start and end of trial: " 'Evidence' is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else [the court] told [the jury] to consider as evidence. Nothing that the attorneys say is evidence. . . . Their questions are not evidence. Only the witnesses' answers are evidence. The attorneys' questions are significant only if they helped you to understand the witnesses' answers. *Do not assume that something is true just because one*

---

you told her that you had been engaged in a drunken brawl at the Nite Cap Bar? [¶] A. That was never said. [¶] Q. Okay. And you told her, at that time, that you had just been in a drunken brawl with a couple of Mexicans? [¶] A. That was never said. [¶] Q. Okay. Does Heather Williams have it out for you? [¶] A. I don't think so. [¶] Q. Okay. Can you think of any reason why she would go tell the police that? [¶] [Defense Counsel:] Well, I'm going to object to that. That's assuming facts not in evidence, Your Honor. [¶] . . . [¶] And it's hearsay as well. [¶] The Court: Overruled. But I'll sustain the objection based on speculation."

*of the attorneys asked a question that suggested it was true.*" (CALCRIM No. 222, italics added.). The prosecutor's questions did not introduce testimonial evidence in violation of Meskan's right to confront witnesses against him.

Also unavailing is defendant's contention that the prosecutor lacked a proper basis for asking defendant about his conversation with Williams and "engaged in a deliberate attempt to put inadmissible and prejudicial evidence before the jury." The prosecutor had a factual basis for asking about the conversation, the substance of which was not inadmissible. At the preliminary hearing, a police officer testified that Williams reported a conversation with Weston and Meskan in which they admitted being "in a fight with a couple of Mexicans." Williams was called as a witness at the preliminary hearing and confirmed that Meskan told her "[h]e was there, and then he got into a fight." Williams was a reluctant witness and after answering a few questions she invoked her right against self-incrimination, refusing to testify further. (U.S. Const., 5th Amend.)[4] Meskan's attorney moved in limine to preclude the prosecutor from using Williams's preliminary hearing testimony, claiming there had been an inadequate opportunity for cross-examination. The prosecutor said he did not intend to use the preliminary hearing testimony and the motion was granted. The prosecutor called Williams as a witness at trial but, in a hearing conducted outside the presence of the jury, she again refused to testify. (U.S. Const., 5th Amend.) Consequently, when Meskan later testified and denied telling Williams he had "been in a drunken brawl with a couple of Mexicans," the prosecutor was unable to call Williams to impeach his testimony.

The unavailability of impeaching evidence, however, does not establish prosecutorial misconduct in asking a question that was founded on prior testimony. There is, to be sure, danger in permitting a prosecutor to attribute statements to an absent third party during cross-examination of a defendant. Such questions may suggest to jurors that "the prosecutor had a source of information unknown to them which corroborated the truth of the matters in question. The rule is well established that the prosecuting attorney

---

[4]  Counsel for Williams later explained that Williams might be found in violation of her parole if she admitted associating with Meskan.

may not interrogate witnesses solely 'for the purpose of getting before the jury the facts inferred therein, together with the insinuations and suggestions they inevitably contained, rather than for the answers which might be given.' " (*People v. Wagner* (1975) 13 Cal.3d 612, 619.) On this record, however, we cannot say the prosecutor's question was asked in bad faith or that the trial court erroneously rejected defense allegations of bad faith. The prosecutor was not required to assume that defendant would deny making a statement that the prosecutor had reasonable grounds to believe he had made. Consistent with defendant's denial of involvement in the assault, he might just as well have answered that Williams misunderstood his statement, that he made the statement in jest, or provided some other explanation for making the statement although denying its truth.

Were there any impropriety in asking the questions, the jury instruction given here makes it unlikely the jury was misled by any suggestion implicit in the questions. The jury was cautioned in clear and explicit terms: "Do not assume that something is true just because one of the attorneys asked a question that suggested it was true." (CALCRIM No. 222.) As a reviewing court, "[w]e presume the jury obeyed the trial court's instruction that questions posed by the attorneys are not evidence." (*People v. Hinton* (2006) 37 Cal.4th 839, 864.) Defendant claims the presumption is rebutted here because the jury sent a note to the court during deliberations requesting Meskan's cross-examination testimony and the Williams police report. The note reflects the jury's interest in the matter but also its focus on the truth of the matter in seeking the police report as evidence of any statements attributed to Williams by the prosecutor's questioning. The court responded to the jury's question: "[t]he police report is not in evidence and cannot be considered during your deliberations." Following the court's response, there is even less reason to assume that the jury disregarded the instructions and relied upon statements implied in the prosecutor's questions.

Moreover, apart from any suggestion contained in the prosecutor's cross-examination, there was compelling evidence that Meskan participated in the fight. Meskan's long-time friend, Weston, testified that Meskan was with him in the fight and provided a detailed account of Meskan's involvement. Weston's testimony was

8

corroborated by a neighborhood resident who witnessed the fight and identified Meskan as one of the assailants. The witness testified he "wasn't completely sure" about his line-up identification because "it was dark," but expressed no hesitation when identifying Meskan at trial as one of the men who was "kicking and punching the Latin guy in the middle of the street." Viewing the evidence as a whole, any prosecutorial misconduct during cross-examination was harmless because it is not "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

2. *Evidence of defendant Meskan's association with a racist group was properly admitted to prove hate crime allegations.*

The prosecution alleged the assaults were hate crimes motivated by the Mexican victims' race, ethnicity or national origin. The defense made an in limine motion to exclude evidence of Meskan's White supremacist gang affiliation as improper character evidence (Evid. Code, § 1101, subd. (a)) and unduly prejudicial (Evid. Code, § 352). The motion was denied and that ruling is challenged on appeal.

In his opening statement to the jury, the prosecutor presaged evidence that Meskan is a skinhead who "lives by the convict code" of racism. Police officers testified that Meskan identified himself as a skinhead when arrested in March 2009 and again in December 2010 when arrested for the present offense. Jail records were admitted showing that Meskan said he was affiliated with the skinheads gang and was placed in administrative segregation for being "involved in gang recruitment by fear or force." Weston testified that Meskan and Allen expressed racist views consistent with the "racially charged environment" of prison and jail.[5] Weston nevertheless insisted that Meskan is not a skinhead and that the assaults were not racially motivated.

---

[5] Weston explained that, in prison, people of different races "don't share food. If there was [a] bowl of food that person was to eat, and you were to eat after [him], [you] don't share open food with people [of] other races. . . . [Y]ou don't share . . . bunks. You don't go in the same cells. You don't cell up with other races. . . . [S]mall amounts of business are allowed, you know, but typically, especially in prison, in prison yards, you don't really comingle that much."

Evidence of Meskan's association with skinheads and racist views was properly admitted to prove motive for the assaults and to substantiate the hate crime allegations. Meskan contends the evidence impugned his character and was more prejudicial than probative because there is no "direct link" between his behavior in prison and his behavior when out of custody. He argues that a prisoner's "behavior is dictated by a need to survive, to be safe, and to navigate the politics of the prison populations. That does not obtain when a person is free from custody." However, evidence of affiliation with racist groups and beliefs is highly relevant in a hate crime prosecution. The possible lack of correlation between a particular person's behavior when jailed or free may be argued to a jury but does not render evidence of jail behavior inadmissible.

In any event, the disputed evidence did not prejudice Meskan. Meskan's concern that the evidence "evoke[d] a great emotional bias" that led to guilt by association is unfounded. The jury acquitted him of all hate crime charges. The evidence of his racist beliefs and gang association did not have an inflammatory impact on the jury.

3. *The prosecutor did not commit prejudicial misconduct during closing argument.*

Meskan contends the prosecutor committed misconduct during closing argument by arguing facts not in evidence and by appealing to the passion and prejudice of the jury.

"We review claims of prosecutorial misconduct pursuant to a settled standard. 'Under California law, a prosecutor commits reversible misconduct if he or she makes use of "deceptive or reprehensible methods" when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " ' [Citations.] In addition, ' "a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and

requested that the jury be admonished to disregard the impropriety. [Citation.]" '
[Citation.] Objection may be excused if it would have been futile or an admonition would
not have cured the harm." (*People v. Dykes* (2009) 46 Cal.4th 731, 760.)

a. Weston's plea bargain

Meskan claims the prosecutor argued facts not in evidence and "misled the jury as
to the terms of Mr. Weston's plea agreement and the reason he received the plea deal."
Weston testified that he was promised credit for time served and probation in exchange
for pleading guilty, providing information on White supremacist groups and testifying at
trial. In cross-examining Weston, defense counsel suggested that Weston tailored his
testimony to obtain favorable treatment and implicated Meskan in the crimes because he
was angry with Meskan for having refused an earlier offer of three years in prison
contingent on all defendants pleading guilty.

The prosecutor responded by arguing that Weston cooperated with the prosecution
because he felt that he, Meskan and Allen had "gone too far" in beating the victims and
should have accepted responsibility by taking the joint plea bargain offered defendants,
and "because he showed some human decency on this night when no one else did."[6]

---

[6] The prosecutor said that, after punching and kicking the men, "Anthony Weston thought, this is too much. [¶] And you don't have to take his word for it. You can judge a man by his actions, because he just didn't think it. He acted on it. He looked there for a moment. He watched Robert [Allen] and Justin [Meskan] kicking these poor young Mayan cousins, and he decided it was enough. He went back into the middle of the street, and he dragged the lifeless body of Alex out of the street, onto the sidewalk. . . . [¶] Officer Smith from the San Francisco Police Department . . . sees him pulling the victim out of the street. And that's why he got a deal, because he showed some human decency on this night when no one else did." Defense counsel objected that the statement was "not supported by the record." The objection was overruled.

The prosecutor continued his argument: "Nobody else showed these poor victims any decency. They fled. They fled . . . running from the police. Meskan first, Allen second. [¶] Weston stayed behind. The only reason he got detained on scene, the only reason he came into our investigation so early, is because he had the human decency to stay behind, to drag Alex's body out of the street. [¶] So you can imagine that he would think that this isn't fair. I'm willing to do three years. I did the crime; I'll do the time. And the guys who ran away and, because they ran away, they didn't get stopped at the scene. They want to go to trial. They want to come and lie in court and say they weren't even there that night. And that made him mad, that there was no loyalty, and there was no recognition for the fact that he was willing to say, no, on this particular night. That's why he — that's why he got a deal."

11

Meskan says the prosecutor misled the jury in stating that Weston received a plea deal "because he showed some human decency" in carrying the victim from the street when, in fact, Weston received the deal for testifying against defendants. There is no reasonable likelihood the jury was misled. A copy of the plea bargain was admitted in evidence and its terms were explored at length during Weston's examination and cross-examination. The jury knew Weston had to testify at defendants' trial to obtain the benefits of the plea agreement. The jury was instructed to consider whether a witness's testimony was influenced by bias or "a personal interest in how the case is decided." (CALCRIM No. 226.) The jury was further advised that Weston was an accomplice to any assault and "testimony of an accomplice that tends to incriminate the defendant should be viewed with caution." (CALCRIM No. 335.) In his closing argument, the prosecutor acknowledged that Weston's favorable sentence was conditioned upon his testimony. The prosecutor's reference to Weston's "human decency" as a motivating factor for the plea offer was a minor point in a long explanation of why Weston was offered, and accepted, a plea bargain.

b. The convict code

The prosecutor argued: "Anthony Weston told you that [Meskan and Allen] subscribed to the convict code. They don't eat with Blacks. They don't share food. They don't cross racial lines. And that's what drove them on this night. When they saw Weston take a punch, they followed the convict code and jumped in a group beating." An unspecified objection was made and discussed off the record. The statement was allowed to stand. Meskan claims the statement lacks factual support and constitutes prosecutorial misconduct.

There was no misconduct. "The prosecution is given wide latitude during closing argument to vigorously argue its case and to comment fairly on the evidence, including by drawing reasonable inferences from it." (*People v. Lee* (2011) 51 Cal.4th 620, 647.) Weston testified that Meskan and Allen expressed racist views consistent with the "racially charged environment" of prison and jail where the races do not share food, bunk together or socialize. From this evidence, the prosecutor could fairly argue that racial

12

self-segregation by inmates is a "convict code" and that those adhering to it would be motivated to join their friend in a cross-racial altercation.

c. San Francisco

Meskan contends the prosecutor improperly appealed to the passion and prejudice of the jury by invoking the community's racial tolerance in his closing remarks. The prosecutor argued, over objection, "This isn't Alabama. This is San Francisco. You know, I have a vision for San Francisco. . . . San Francisco is a town that welcomes our hard working immigrants. San Francisco is a town that can celebrate a Good Samaritan who would jump to save a stranger. San Francisco is a city where somebody can be redeemed, Anthony Weston, when they drag a victim out of the street, and then confess to their crimes. Hate prejudice has no place in San Francisco. . . . I finish by asking you, on behalf of Alex and Omar, on behalf of our town, on behalf of the City of San Francisco, . . . I ask for justice for Alex and Omar."

A prosecutor may properly refer to "the jury as the 'conscience of the community' or as representatives of the community." (*People v. Ledesma* (2006) 39 Cal.4th 641, 741.) A prosecutor may not, however, " 'make arguments to the jury that give it the impression that "emotion may reign over reason," and to present "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response." ' " (*People v. Redd* (2010) 48 Cal.4th 691, 742.) Nor may a prosecutor "suggest that jurors consider public opinion in deciding guilt." or " 'urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking.' The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence. Jurors may be persuaded by such appeals to believe that, by convicting a defendant, they will assist in the solution of some pressing social problem. . . . [¶] But a request that the jury "condemn" an accused for engaging in illegal activities is not constitutionally infirm, so long as it is not calculated to excite prejudice or passion.' " (*Id.* at p. 743, fn. 25.)

The prosecutor's brief reference to his "vision" of San Francisco as a place without race-based hatred was not likely to divert the jury from its duty to weigh the evidence rationally. The remark came at the end of a long, 37-page closing argument that thoroughly reviewed the evidence and applicable legal principles. Race hatred was an element of the charged crimes and the subject of extensive trial testimony. An eyewitness testified that the words he heard during the attack, like "White power" and "fucking spics," is "[j]ust stuff you don't hear in San Francisco." When read in context, the prosecutor's argument was not a " 'deceptive or reprehensible method[]' " used to persuade the jury to abandon reason for passion. (*People v. Dykes, supra,* 46 Cal.4th at p. 760.) To whatever extent the prosecutor's closing remarks may have strayed outside the proper scope of argument, there was no prejudice. As previously indicated, Meskan was acquitted of all hate crime charges.

*4. Meskan's failure to dispute imposition of a booking fee forfeits the claim on appeal.*

The trial court imposed a $135 jail booking fee without an express finding of Meskan's financial ability to pay the fee. (Gov. Code, § 29550.2.) Meskan contends the court erred by imposing the fee without the proper findings and maintains there is no evidence to support his ability to pay or the actual administrative cost of booking. The Attorney General correctly asserts that Meskan forfeited his claims by failing to object in the trial court to imposition of the fee. "[A] defendant who does nothing to put at issue the propriety of imposition of a booking fee forfeits the right to challenge the sufficiency of the evidence to support imposition of the booking fee on appeal." (*People v. McCullough* (2013) 56 Cal.4th 589, 598.) " '[I]t is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided.' " (*Id.* at p. 593.)

**B. Robert Allen's appeal**

1. *The prosecutor did not commit prejudicial misconduct in his opening statement.*

Allen contends the prosecutor's opening statement was unsupported by the record and appealed to passion and prejudice. The prosecutor's statement does contain several inaccuracies and rhetorical flourishes but no use of " 'deceptive or reprehensible methods

to persuade the jury' " amounting to prejudicial misconduct. (*People v. Williams* (2013) 56 Cal.4th 630, 671.)

a. The victim's work

During opening statement, the prosecutor said the evidence would show that Alex Cauich "works 100 hours a week, and he sends every penny he can back home." Allen complains the statement was "not born[e] out by the evidence he would present." Alex testified that he works "about 50 hours a week" and was never asked if he sends money home. There does not appear to be any deliberate effort to mislead the jury. The prosecutor may have overstated Alex's work hours because he thought Alex worked 50 hours at each of two restaurant locations rather than 50 hours total.[7] The prosecutor may never have asked Alex if he sent money home because this line of questioning about Alex's life and work habits drew numerous relevancy objections. The prosecutor's assertion that Alex "sends every penny he can back home" had some basis in the fact that Alex seemed to live below his means, in a residential hotel room with two other men. To the extent the prosecutor's statement was an improper appeal for victim sympathy, as the defense now asserts, it was a small impropriety without prejudicial impact.

b. The victim heard an ethnic epithet.

The prosecutor said Alex would testify that, while waiting for his cousin outside the Nite Cap Bar, "he hears somebody make an anti-Latino epithet towards him, something along the lines of, you fucking Latino. And then the next thing he knows, he's punched in the middle of the forehead." This differed slightly from Alex's trial testimony. Alex testified he was punched in the face and "maybe" heard someone say something at the moment of impact but "got punched so hard" that he does not "remember any exact words." There is no indication that the prosecutor misstated the

---

[7]     The prosecutor's direct examination of Alex suggests this possible misunderstanding: "Q. . . . [I]n a one-week period, how many hours a week do you work? . . . [¶] [A.] Well, I'm just working too much. I maybe work about 50 hours a week. [¶] [Q.] And do you have more than one job? [¶] A. Yes. I'm working with the same company. Two jobs, but with the same company. [¶] Q. Okay. Is the 50 hours a week at the one location, or is [it] at both locations? [¶] A. No. At both locations."

15

expected testimony. The prosecutor seems to have thought Alex would testify to hearing an ethnic epithet because the prosecutor pressed Alex on direct examination to recount what he heard. Alex testified with the assistance of a Spanish interpreter and may have had difficulty recounting words spoken in English. The minor discrepancy between what the prosecutor said Alex would testify, and what he did testify is immaterial. While Alex could not recall what was said, other witnesses substantiated the prosecutor's representation that ethnic epithets were spoken during the attack.

c. "Wife-beater" undershirt

Allen contends the prosecutor wrongly appealed to the passion and prejudice of the jury by saying Allen was arrested at the scene of the crime "wearing a very distinctive white wife beater—you're going to hear that come up again and again, a distinctive white wife beater shirt." This slang term for a tank top undershirt was used by two different trial witnesses. An eyewitness to the street fight said one man "was doing a majority of the kicking" and described that man as "wearing a white, like undershirt, like tank top. I think they call them wife beaters." Another eyewitness, when asked what the White men were wearing, said "[l]ike button up t-shirts, and a couple of them had a wife beater on." The prosecutor did not commit misconduct by introducing the jury to a slang term employed by witnesses in the case.

d. Skinhead groups

The prosecutor told the jury Weston would testify that he accepted a cooperation agreement with the prosecution because he owed no loyalty to Meskan and Allen after they refused "a fair deal" for a joint plea and "[m]ore importantly, he's going to tell you about the second reason that he took this deal. And the second reason is because he's tired of this lifestyle. He's tired of the drugs. He's tired of the violence. He's tired of the bad influences, the bad influences in his life. And he realized he needed to make a clean break. And his participation as a prosecution witness is much more than just coming to court and telling you these are the two guys who [did] it. [¶] It's much more than that. He has turned his back on the entire lifestyle. He's going to tell you that he used to be a skinhead. And he's going to tell you that, as part of the deal, he's given the prosecution,

16

he's given law enforcement information. That's part of the deal. And you'll see a copy of the deal that we reached with Mr. Weston. He's naming names. [¶] He's told us about the three active skinhead groups operating here.. . . . He's named 40 names of the active skinhead leadership here in this city. And he's told us what they're doing, what they're involved in. . . . I was going to tell you that the skinhead movement is growing here in San Francisco because of realignment, because people who used to go to state prison are now going to county jail. He's going to tell you that people are coming to San Francisco, because, in his words, if . . . you've got a bag of speed in San Mateo County, you're going to state prison. If you got a bag of speed in San Francisco, you're going to be sent to a drug program."

Allen contends the prosecutor presented "inflammatory rhetoric to the jury" that "hoards of drug-dealing skinheads were headed for San Francisco" without evidentiary support for the assertions. The references to a growing skinhead movement because of lenient drug crime sentencing was unsubstantiated and improper. Most of the prosecutor's address to the jury, however, was an accurate summarization of Weston's testimony and relevant to the hate crime allegations. Weston said there are "a lot of different types of skinheads" and "they consider themselves a movement, not a gang." He testified that he was affiliated with the skinheads for about four years but was no longer a "member" because he "was tired of prison and crime and drugs" and did not "want to be involved in this type of life style anymore." Weston testified that he identified skinhead groups as part of his plea agreement, consistent with the prosecutor's opening statement.

We reject Allen's contention that all "evidence and argument about skinhead gangs . . . was not relevant" because there was no allegation that the crimes were committed to benefit a gang. While no gang enhancements were alleged, there were allegations that the assaults were hate crimes motivated by the victims' race, ethnicity or national origin. Evidence of Weston's and Meskan's affiliation with a racist group like the skinheads was highly relevant to the hate crime allegations. Allen argues that the prosecutor's discussion of skinhead groups wrongly insinuated that Allen was a gang member. But the prosecutor did not mention Allen when summarizing Weston's former

17

association with skinheads. Nothing in the prosecutor's summarization contradicted Weston's testimony that Allen expressed racist views but was not a member of the skinheads. Viewed as a whole, the prosecutor's statements about skinhead groups were proper. The unsubstantiated remark about the skinhead movement growing in San Francisco because of realignment and lenient drug crime sentencing was a minor impropriety without prejudicial impact. "Although defendant singles out words and phrases, or at most a few sentences, to demonstrate misconduct, we must view the statements in the context of the argument as a whole." (*People v. Dennis* (1998) 17 Cal.4th 468, 522.)

e. Runic writings

Allen asserts the prosecutor falsely attributed runic writings to him. The prosecutor told the jury the police searched Allen's apartment and "located paper work within Robert Allen's school paper work. And on this paper work, there's runic writings. You're going to hear from witnesses that runic writings are used by White supremacists. [¶] It's claimed by White supremacists, who trace it back to the Nazis, who saw runic writing as a descendent—as the origin of the Germanic language. And on this page that lists all the runic alphabet and all the English alphabet, so you can translate one to the other, you'll see words on this page. And one of the words, one of the phrases that you'll see translated into runic, is White power, the very phrase that was yelled during this assault."

Trial testimony largely supports the prosecutor's statements. Sergeant Schwarz-Choy testified she found a piece of paper with runic writing among loose papers in a box located in a closet in Allen's apartment. The closet contained other papers, including handwritten homework bearing Allen's name. The runic writing was therefore found in a closet shared with Allen's school paperwork rather than, as the prosecutor said, "within Robert Allen's school paper work." The difference is minor and inconsequential. The prosecutor's assertion that "runic writings are used by White supremacists" is fully supported by the record. Weston testified that skinheads use runic writing as a secret

18

language and the runic writing located in Allen's apartment contained the phrase "White power."

f. Kicks to the victims' heads

Allen argues the evidence does not support the prosecutor's statement that he and Meskan "brutally kicked [the victims] in the head while they're down on the ground." The statement is well supported by the evidence. Weston testified that Allen and Meskan kicked Alex and that a resident saw Alex on the ground surrounded by men who "repeatedly kicked [him] in the face." Omar testified that three men threw him to the ground and punched and kicked him in the head and back. The opening statement matched the evidence presented.

*2. The prosecutor did not commit prejudicial misconduct in his closing statement.*

a. Interactions with Mott

A witness who lives near the Nite Cap Bar testified that he saw a group of people that looked like skinheads talking to a bar regular named "Mott" just before the assault. The resident described Mott as "the neighborhood skinhead" and said he and Weston "had similar tattoos" and were talking together. In closing argument, the prosecutor argued the assaults were hate crimes and interpreted the interaction between Weston's group and Mott as "checking . . . in with [Mott] to get the play call." The prosecutor argued: "These two Mexicans wandered into the wrong bar. [Mott] . . . the resident skinhead made a call. And these guys were the enforcers."

Allen argues the prosecutor "urged the jury to draw the unreasonable inference that Mott had passed orders" to defendants "to go beat up Mexicans" when there was no evidence that Mott was directing defendants' actions. There was no misconduct. "Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial. [Citation.] Whether the inferences the prosecutor draws are reasonable is for the jury to decide." (*People v. Dennis, supra,* 17 Cal.4th at p. 522.) The jury here appears to have found the inference unreasonable. The jury acquitted defendants of hate crime charges and thus, even if the remarks were improper, they were not prejudicial.

19

b. Allen as a "skinhead wannabe"

Allen says he was wrongly referred to as a "skinhead wannabe" during closing argument when "there was no evidence that Allen has aspirations to become either a skinhead or Nazi." In referring to Allen, the prosecutor said: "[W]e've put in no evidence that he's a skinhead. That's not what we're alleging here. But what we're saying is, he likes hanging out with them, right? He hangs out with folks like Richard Trietsch, who has a swastika tattooed on his leg. He lived with Richard Trietsch in Daly City and invited Richard Trietsch into his home in San Francisco. [¶] Inspector Choy told you that, as soon as she walks into Allen's apartment at 850 Geary, the first thing that you see in the common area of the hallway is a photograph of Richard Trietsch saluting before a Nazi flag." The prosecutor recalled Weston's testimony that Allen held racist views and then proceeded to describe the assault: "[T]here were a lot of actions which show that this was a hate assault. Allen was the loudest one. He's the wannabe. That's what I keep referring to him as. He wants to prove himself to the skinheads, to the Nazis."

The prosecutor's argument was a fair comment upon the evidence and the inferences to be drawn from it. There was no testimony that Allen wanted to prove himself to the skinheads, as Allen notes on appeal, but the prosecutor was free to argue that the evidence of Allen's racist views, close association with White supremacists and prominent display of Nazi décor in his apartment supported the inference that Allen was a skinhead "wannabe."

c. Comments about defense counsel.

Allen claims the prosecutor twice used his closing argument to disparage defense counsel. "Personal attacks on opposing counsel are improper and irrelevant to the issues." (*People v. Sandoval* (1992) 4 Cal.4th 155, 184.) Here, the prosecutor's remark that defense counsel "echoed" defendants' view that the victims "didn't belong" was improper, but any harm was obviated by the court's swift action in striking the statement.

The other disputed remark concerns the prosecutor's rebuttal to defense counsel's accusation that the prosecution engaged in an "egregious . . . manipulation of evidence" in presenting to the jury a photograph of a Hitler screensaver on one of the computers

20

seized from Allen's apartment rather than the computer itself. The defense claimed the computer with the Hitler screensaver belonged to someone else and the second computer belonged to Allen. To prove its point, the defense brought the second computer to court, turned it on, and showed that the screensaver was a photograph of Allen. Defense counsel argued that the prosecutor could have done the same but did not because it would contradict his theory of the case. Defense counsel called upon the jury to defend the constitution and "stand between an overzealous government and the people who live here."

In rebuttal, the prosecutor said defense counsel "waived the American flag and talked to you about how important . . . our constitutional rights are. And then they want to come back and say, well, why didn't we turn on the computer? The inspector told you the reason. She told you that we're not allowed to do that. It requires a search warrant." The prosecutor said the defense should not "blame us for not turning on the computer here in the courtroom, when we would violate constitutional rights. We are not allowed to do that."

Allen argues that the prosecutor wrongly "berated" defense counsel for "waiv[ing] the American flag." The prosecutor's argument was not a personal attack upon defense counsel but a fair response to issues raised by the defense. Allen asserts that the prosecutor's response, even if not a personal attack, was misconduct because the response was legally incorrect in asserting that the prosecutor could not turn on the computer without obtaining a search warrant. The point is immaterial because the jury was not likely to be misled by the attorneys' pointed exchange over the handling of computer evidence. The computer was turned on and the jury could draw its own conclusion about ownership.

3. *Evidence of Allen's skinhead associations and Nazi paraphernalia seized from his apartment was properly admitted to prove hate crime allegations.*

Allen claims the computer with a Hitler screensaver and a paper and hammer with runic writing seized from his apartment were wrongly admitted to prove his character. He further claims that evidence of the racist views of Weston, Meskan and Trietsch "was

irrelevant and highly prejudicial." The evidence was properly admitted. As explained in connection with Meskan's appeal, evidence of Allen's association with skinheads and racist views was properly admitted to prove motive for the assaults and to substantiate the hate crime allegations.

4. *The court properly admitted limited evidence regarding gangs.*

The court admitted evidence that Meskan identified himself to jailers as a skinhead when arrested in March 2009 and again in December 2010 when arrested for the present offense. Allen argues that "evidence of gangs is highly prejudicial" and negatively impacted his case despite the prosecutor's clear acknowledgment in closing argument that there is "no evidence that [Allen is] a skinhead." The limited evidence was properly admitted and not prejudicial. The jury was not misled to think Allen was a gang member or disposed to White supremacist gang violence. The jury acquitted defendants of all hate crime allegations.

5. *Allen's battery conviction does not violate the double jeopardy clause.*

As noted above, Allen was convicted of two counts relating to Alex: (1) assault by means of force likely to cause great bodily injury (§ 245, subd. (a)(1)) with personal infliction of great bodily injury (§ 12022.7, subd. (a)) and (2) battery with personal infliction of serious bodily injury (§ 243, subd. (d)). Execution of sentence on the battery count was stayed because the assault and battery arose from the same course of conduct. (§ 654.)

Allen contends that staying punishment on the battery conviction is insufficient and that the conviction must be vacated because it violates the double jeopardy clause. He mistakes the scope of the clause. The double jeopardy clause provides that no "person [shall] be subject for the same offence to be twice put in jeopardy of life or limb." (U.S. Const., 5th Amend.) "The Clause protects only against the imposition of multiple criminal punishments for the same offense, [citations], and then *only when such occurs in successive proceedings*." (*Hudson v. United States* (1997) 522 U.S. 93, 99, italics altered.) In a single trial, the double jeopardy clause does no "more than prevent the sentencing court from prescribing greater punishment than the Legislature intended."

22

(*Missouri v. Hunter* (1983) 459 U.S. 359, 366.) "Federal law, like California statutory law, clearly recognizes that cumulative punishment may be imposed under two statutes, even where they proscribe the same conduct, if the legislature has specifically authorized cumulative punishment." (*People v. Sloan* (2007) 42 Cal.4th 110, 121.)

The California Legislature has specifically authorized multiple conviction. (§ 954.) However, " '[a] judicially created exception to the general rule permitting multiple conviction "prohibits multiple convictions based on necessarily included offenses." ' " (*People v. Sloan, supra,* 42 Cal.4th at p. 116.) " '[O]nly a *statutorily* lesser included offense is subject to the bar against multiple convictions in the same proceeding.' " (*Id.* at p. 118, italics added.) Allen's conviction for battery with personal infliction of serious bodily injury is not a statutorily lesser included offense to assault by means of force likely to cause great bodily injury. It is only the assault's enhancement for *actual* infliction of great bodily injury (deemed equivalent to serious bodily injury)[8] that brings the elements of the two offenses into alignment. But enhancements may not be considered when determining if one offense is a necessarily included offense of another offense. (*Id.* at p. 114.) "In deciding whether multiple conviction is proper, a court should consider only the statutory elements" of the substantive offenses. (*Id.* at p. 118.)

While multiple conviction for the same course of conduct is generally permitted, multiple punishment generally is not. (*People v. Sloan, supra,* 42 Cal.4th at p. 116.) Section 654, subdivision (a) provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." Where, as here, a defendant is convicted of two offenses arising from the same course of conduct, the court stays execution of sentence on the offense with the shorter term of imprisonment. (*People v. Sloan, supra,* at p. 116.) The court properly applied these principles here.

---

[8]         " ' "[S]erious bodily" injury is the essential equivalent of "great bodily injury" ' " for most purposes. (*People v. Sloan, supra,* 42 Cal.4th at p. 117.)

# DISPOSITION

The judgments are affirmed.

_____
Pollak, J.

We concur:

_____
McGuiness, P. J.

_____
Siggins, J.